**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

AMY WEISCHEDEL CAMPBELL[1],　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　v.　　　　　　　)　　1:03CV00892
　　　　　　　　　　　　　　　　　)
THE TOWN OF SOUTHERN PINES; THE　)
SOUTHERN PINES POLICE DEPARTMENT;　)
GERALD GALLOWAY; STANLEY　　　　)
KLINGENSCHMIDT; CHRIS BURGESS;　　)
NICK POLIDORI; OTHER UNNAMED　　)
EMPLOYEES OF THE TOWN OF SOUTHERN　)
PINES,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants.　　)

## MEMORANDUM OPINION AND ORDER

**Eliason, Magistrate Judge**

Plaintiff is a former officer of the Southern Pines Police Department ("SPPD"), who was discharged allegedly for inadequate performance. The discharge was based on three incidents. She claims her discharge resulted from sex discrimination based on disparate treatment and retaliation.

The case is before the Court on two motions: defendants'[2] motion for summary judgment and plaintiff's motion to strike a

---

[1] As will be discussed, plaintiff was employed by defendant The Southern Pines Police Department (SPPD). When her employment began, she was married and known as Amy Weischedel White. Later, she and her husband separated and divorced and, for a time, she used her maiden name, Weischedel. Finally, she was remarried and now uses Weischedel Campbell. For this reason, various documents in the record refer to her using these different last names.

[2] Defendants Nick Polidori and Other Unnamed Employees of the Town of Southern Pines were previously dismissed by voluntary dismissal. Plaintiff also admits in her amended complaint that the SPPD is not a legal entity capable of being sued and that there is legal unity between it and defendant Town of Southern Pines (the Town). Therefore, the only real defendants remaining in the case are the Town, Gerald Galloway, Stanley Klingenschmidt, and Chris Burgess.

portion of defendants' reply brief in support of the motion for summary judgment. Because the motion to strike has no impact on the outcome of the motion for summary judgment, it will be denied and only the motion for summary judgment will be discussed further.

## I. Facts

Plaintiff applied to become a patrol officer with the SPPD. She was offered employment by defendant Galloway, Chief of the SPPD. Her employment began on May 22, 2000. It was conditioned on plaintiff completing Basic Law Enforcement Training (BLET), passing a physical and psychological examination, and completing firearms qualification. She was also required by the State of North Carolina to undergo a one-year probationary period.

Plaintiff was paid as a full-time employee while completing BLET. After completing it, she started the SPPD's 13-week Field Training Program. Defendant Klingenschmidt supervised plaintiff during this time and gave her a six month performance assessment during the training. Because she had not yet completed her training, this assessment was not based on her actions as an independent officer. Eventually plaintiff did successfully complete her training and was assigned to a patrol team.

One of the incidents which plaintiff's employer cited as a basis for the discharge occurred during her training. On October 10, 2000, plaintiff was assisting Sergeant Nick Polidori and another officer, Officer Hogan, on a domestic violence call. Polidori and Hogan became involved in a physical altercation with a suspect. Defendants contend that Polidori ordered her to help,

-2-

but that she initially stood by watching as the officers wrestled with the suspect on the ground. Shortly thereafter, he ordered her to handcuff the suspect and she complied. Polidori described the situation in a daily report, stating that it was plaintiff's first fight, that she did not know what to do, that she did not want to get in the way, that he counseled plaintiff not to hesitate in the future, and that he believed plaintiff understood. (Klingenschmidt Dep. Ex. 6) He graded her "Below Standard" that day in the categories of "Stressful field performance" and "Officer safety-stressful situations." (Id.) Plaintiff was later graded as "Standard" in all categories. (Id. Exs. 3, 5) This incident did not adversely affect plaintiff successfully completing her training and being assigned to a patrol.

The SPPD is divided into patrol, investigations, and communications divisions. Plaintiff worked in the patrol division which was subdivided into four teams. Each team was supervised by a lieutenant and a sergeant, with officers working under them. After completing her training in December 2000, plaintiff was initially assigned to Baker Team. Her supervisors were Lieutenant Rodney Hardy and Sergeant Charles Campbell. However, after Galloway learned that plaintiff became romantically involved with Campbell, he assigned Campbell to the Adam team and instructed Campbell not to supervise plaintiff. (Galloway Aff.)

In May of 2001, Galloway reallocated personnel to better balance experience on his teams and plaintiff was reassigned to Charlie Team. Defendant Burgess was the lieutenant and Polidori

-3-

was the sergeant. In June of 2001, Burgess recommended that plaintiff be promoted to Patrol Officer I because she met the time of service and educational requirements and had performed her job in a satisfactory manner. (Galloway Aff. ¶ 23, Burgess Aff. ¶ 17, Def.'s Ex. 4) She was so promoted.

On August 29, 2001, Burgess and plaintiff met to talk about some issues that he had with her performance. (Burgess ¶¶ 19, 21) During this conversation, plaintiff voiced some complaints that were at least partially based on perceived sexual harassment. Plaintiff and Burgess have given different descriptions of the exact nature of her comments, but the important fact is that, whatever plaintiff said exactly, it was sufficient to cause Burgess to report the matter to Galloway as a complaint of sexual harassment. Galloway then sought advice from Town officials, including the Town's attorney. Following this consultation, Galloway had plaintiff give him a written report of all of her allegations of sexual harassment or discrimination. She did so on September 25, 2001. (Pl.'s Aff. ¶ 11 and Att. A)

Plaintiff's memorandum to Galloway was extensive and included complaints about defendants Burgess and Klingenschmidt, as well as Sergeant Polidori and others. She detailed numerous incidents which she contended amounted to gender discrimination. Some of the allegations very clearly amounted to allegations of gender discrimination or sexual harassment. For instance, she claimed that Burgess once stated at a Christmas party that, "[w]omen do not belong in law enforcement" and that Burgess sometimes stood behind

-4-

her in order to look down her shirt. (Id.) Other allegations are not so clear, such as sexual comments made by various officers or horseplay of a sexual nature between officers. Other complaints were in the nature of unfair treatment, such as inconsistent criticism, being denied leave time when others were granted it, or being unfairly expected to have certain knowledge about some types of cases. Some incidents appear to have little connection with gender discrimination, such as alleged harassment for writing another officer a traffic ticket.

After plaintiff submitted the memorandum, Galloway took it and discussed it with the Town's attorney and Eleanore "Jane" Mayfield Dreher, the Town's Administrative Services Director and Town Clerk. (Galloway Aff. ¶ 30) Dreher read the memorandum and identified incidents that she felt could be construed as sexual harassment. Galloway then interviewed the persons that he believed would have knowledge of the allegations. He wrote up the results and he and Dreher then discussed them. (Id. ¶ 31) They concluded that no sexual harassment or gender discrimination had occurred, but Galloway did decide that some inappropriate conduct had occurred. Galloway issued warnings to some officers, addressed the issues in some officers' performance reviews, and brought in an attorney to conduct sexual harassment training. (Id. ¶¶ 32, 34)

The second incident which was cited as a basis for plaintiff's discharge occurred on September 4, 2001. This was between the time plaintiff had her initial conversation about sexual harassment with Burgess and the time she submitted her memorandum to Galloway.

-5-

Just after 12:00 A.M. on that day, shots were fired during a burglary at the home of a resident of the Town. The resident was able to give a description of the vehicle driven by the burglars/assailants. Plaintiff and another officer were responding to the call when the other officer saw a vehicle that was somewhat different from the description given, but apparently close enough to arouse sufficient suspicion to have plaintiff pull it over. According to plaintiff's report from that night, the car turned into a driveway and she pulled in behind it. (Galloway Dep. Ex. 13) She saw two occupants talking in the vehicle before one exited, stood by the door, and then ran behind a house. Plaintiff waited for radio traffic to clear and then called in her location. At that point, Sergeant Polidori arrived, the other person in the car jumped out and began to run, and Polidori left his car and chased the man into some woods. Plaintiff remained in her vehicle, but pulled back onto the road and drove to a point where she hoped to intercept the suspect Polidori was chasing and got out of her car. However, Polidori lost him in the woods. Plaintiff and Polidori then unsuccessfully searched the woods with Officer Hogan who later arrived. (Id. Ex. 7) Polidori wrote a short memorandum essentially corroborating these events. (Burgess Dep. Ex. 2)

On the bottom of Polidori's memorandum is a handwritten note, added by Burgess, stating that he asked plaintiff why she did not follow Polidori. She replied that Polidori got out and ran so fast that she did not feel she could catch up and that she decided to cut the suspect off instead. Burgess wrote that he told plaintiff

-6-

that she should have followed Polidori anyway in case he was ambushed or got into a fight. (Id. p. 38 and Ex. 2) Plaintiff was not disciplined for the incident and it appears that nothing more was said at this time concerning plaintiff's actions on September 4, 2001. Galloway states that he was informed of the incident by Burgess and would have suspended plaintiff except for the fact that he was afraid that it would be construed as retaliation for her recent complaint of sexual harassment. (Galloway Aff. ¶ 27)

In December of 2001, plaintiff was transferred from Burgess' team to that of Klingenschmidt. Nevertheless, the February 13, 2002 scheduled performance evaluation of plaintiff was completed by Burgess. (Galloway Dep. Ex. 46) Galloway approved the evaluation on February 15, 2002 and forwarded it to the Town Manager, who also approved it. The evaluation gave plaintiff a "needs improvement" rating in every category and overall. This is the lowest rating that can be given and it precludes an officer from receiving a pay increase. (Burgess Dep. p. 26) The evaluation also recommended that the probationary period which plaintiff began at the time of her promotion to Patrol Officer I be extended for 60 days. (Galloway Dep. Ex. 46)

On March 5, 2002, plaintiff filed a formal written grievance challenging her evaluation. (Pl.'s Aff. ¶ 11 and Att. B) In stating her reasons for filing the grievance, plaintiff claimed first that Burgess treated her in an unfair and unjust manner based on negative personal feelings. However, she contends that these

-7-

"feelings" were based on her prior complaints of harassment and his belief that "women do not belong in law enforcement." (<u>Id</u>. Att. B)

A grievance hearing was set for March 12, 2002. Plaintiff arrived early and learned that Galloway, Burgess, and Klingenschmidt were meeting alone in Galloway's office. After about an hour, that meeting ended and the same three men convened plaintiff's grievance hearing. (Pl.'s Dep. Vol II p. 178) Plaintiff did not wish to proceed with the hearing because she believed that the outcome had already been decided during the meeting in Galloway's office. Therefore, she refused to participate in the hearing other than to ask that the grievance process move to "Stage 2." (Pl.'s Aff. Att. B)

The following day, plaintiff sent a letter to Galloway. (Pl.'s Aff. Att. C) The letter stated that it was sent at Galloway's request and in order to set out plaintiff's concerns about the grievance hearing. Among other things, the letter described Klingenschmidt raising his voice when plaintiff would not discuss her grievance. She wrote that Klingenschmidt had said that "'by putting up these walls and not talking, you are only hurting yourself'" and that "'the only person you have to prove anything to is me and I will remember this.'" (<u>Id</u>.) He also allegedly said that he would be watching plaintiff for the next 60 days and called her a disgruntled employee. (<u>Id</u>.) Plaintiff said she considered these words to be a threat. Klingenschmidt agrees that he told plaintiff that he would be keeping an eye on her performance. This was because she had been placed on probation and he needed to watch

her to make sure her performance improved.  (Klingenschmidt Aff. ¶ 16)

On March 18, 2002, plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging gender discrimination and retaliation.  (Pl.'s Aff. Att. D)  Galloway received a copy of the charge from the EEOC sometime around March 21, 2002. (Galloway Dep. p. 159)  Also, plaintiff's grievance form reflects that a second-stage grievance hearing was held on April 3, 2002 and that plaintiff asked to move to the third stage because Galloway did not render a decision on the second stage hearing. (Pl.'s Aff. Att. B)  As will be discussed next, plaintiff's employment was terminated before the third-stage hearing was held.

On April 4, 2002, the third incident occurred.  That night, Klingenschmidt, Sergeant Tim Mercer, and Officer Jack Austin became involved in a high-speed chase with a truck driven by Carlton Terry. (Austin Dep. Ex. 3)  Klingenschmidt and Mercer were in one patrol car and Austin was in another.  Terry pulled his truck into the parking lot of the "Pink Palace" and ran from the truck. (Id.) Because they were closer to Terry at the time, Klingenschmidt and Mercer arrived first and Mercer exited the car and began to chase Terry on foot.  (Id. p. 74)  In the meantime, Austin also arrived and began to chase Terry.  At about the same time as he began chasing, Austin saw Mercer stop chasing and begin hitting his flashlight with his hand because it had apparently malfunctioned. Austin continued chasing Terry and last saw Mercer standing by an abandoned car, hitting his flashlight.  Austin then chased Terry

-9-

alone as he ran from the parking lot and along Indiana Avenue. (<u>Id</u>. p. 76)

As Austin ran alone after Terry, he heard Mercer call him on the radio and ask his position. He replied that he was on Indiana Avenue and Mercer asked him to try again, meaning that he did not understand the transmission. (<u>Id</u>. 77-78) Plaintiff, who was now in the area in her patrol car, heard and understood the transmission and drove to Indiana Avenue. (Pl.'s Dep. Vol. III p. 104) There she spotted Austin, who was running in the same direction she was driving. She did not see the suspect, who Austin claims was ten or fifteen feet in front of him at the time.[3] (<u>Id</u>. p. 111, Austin Aff. ¶ 8) However, she did think that she saw movement at the corner ahead of Austin where Henley Street crossed Indiana. Therefore, she drove ahead and turned right onto Henley Street. (Pl.'s Dep. Vol. III p. 106) She then drove to the end of the street looking for the suspect behind houses on Henley. (<u>Id</u>. p. 107) Austin testified in his deposition that there were three fairly closely spaced houses on the street. (Austin Dep. pp. 81-82 and Ex. 4)

---

[3]Austin states in his affidavit that the suspect was ten to fifteen feet in front of him when plaintiff drove past. (Austin Aff. ¶ 8) He did not state this in his report at the time of the incident, in a memorandum that he wrote soon after the chase, or in his deposition. He also does not explain how, after chasing the suspect for what he estimated at his deposition to be 550 feet and still being that close to him, he completely lost the suspect in the next 250 feet. (Austin Dep. Ex. 4) Plaintiff indicated numerous times in her deposition that she saw no suspect when she passed Austin and that he was not running full speed when she passed him, but was moving faster than a walk and looking in different directions with his flashlight as if looking for someone. (<u>See</u> <u>e.g.</u> Pl.'s Dep. Vol. III p. 118) In ruling on a summary judgment motion, the Court must view the evidence in a light most favorable to plaintiff.

Unable to locate the suspect, plaintiff turned around, and came back closer to the Indiana/Henley intersection. She saw Austin, who had lost sight of the suspect near the corner of the intersection. Also, his flashlight was not working. He asked to borrow plaintiff's flashlight. She reentered her car to reposition its lights to illuminate the area behind the houses. She testified that Klingenschmidt drove up as she was doing this, told her to get out of the car, and drove away. (Pl.'s Dep. Vol. III p. 108) She then joined Austin in searching behind the three residences on Henley Street. (Pl.'s Dep. Vol. III p. 108) They searched together for ten to fifteen minutes. Before getting plaintiff's flashlight, Austin had searched for two to three minutes. (Austin Dep. p. 82)

Sometime later, Austin completed a report that essentially follows the events as he described them in his deposition testimony. (Austin Dep. Ex. 3) However, there are several points worth noting. First, he does not mention in the report that Mercer began chasing the suspect but then stopped, leaving him to pursue the suspect alone. Second, Austin originally wrote that plaintiff turned onto Henley in an attempt to cut off the suspect, but later whited the phrase out. He claims it was "an error" in the report brought to his attention by Mercer. Mercer asked if Austin knew for sure that this was the reason plaintiff made the turn onto Henley. When Austin replied that he did not know for sure, Mercer told him that "'[i]f it's an assumption, it should not be in the report.'" Rather than attempt to contact plaintiff in order to

-11-

find out whether it truly was an error, Austin removed the phrase.[4] (Austin Dep. pp. 85-86)  This purported correction of an assumption error leads to the final item of interest.  Austin's report states that he knew his radio malfunctioned as he ran along Indiana Avenue because he could hear "other units" calling him, but his radio would not transmit.  (In his deposition, he stated that the "other units" were actually Mercer.  (Austin Dep. p. 77))  No explanation was given as to how Austin actually knew that his radio malfunctioned, as opposed to Mercer's malfunctioning or Mercer simply failing to understand the transmission, which was being made during a foot chase.  Nor has an explanation been given of how plaintiff quickly found Austin on Indiana Avenue if Austin could not transmit his position due to a radio malfunction.

In addition to his official report, Austin also wrote a memorandum.  (Austin Aff. Ex. A)  Austin states that he wrote it at Klingenschmidt's behest.  Austin says that when he complained to Mercer about plaintiff failing to back him up, Mercer referred him to Klingenschmidt, and that Klingenschmidt requested the memorandum.  (Id. ¶¶ 15-16)  In the memorandum, Austin states again that his radio malfunctioned because he could hear officers calling him, but could not transmit.  He also states that plaintiff was very close to him and the suspect when she passed them and could have, in his opinion, caught the suspect if she had gotten out at the time she drove past.  He then relates that he saw plaintiff

---

[4]Mercer testified in his deposition that he did not specifically remember why the phrase was removed.  (Mercer Dep. p. 42)

turn onto Henley and wait.  After searching for the suspect for two minutes without a functioning flashlight, he ran to her to borrow her flashlight and they then searched on foot together.  He claims that plaintiff should have exited her vehicle sooner to help him, especially since his radio and flashlight were not working. (Austin Aff. Ex. A)

Following his deposition in this case, Austin submitted an affidavit which slightly alters his earlier version of the events. He now states that plaintiff was sitting in her vehicle when he approached her to ask for the flashlight, but in his deposition, he could not remember.  (Austin Aff. ¶ 13, Austin Dep. p. 80)  He also states that he does not remember what plaintiff did while he searched behind the Henley Street residences on foot using her flashlight.  (Austin Aff. ¶ 13)  In his report, memo, and deposition, he remembered plaintiff searching with him.[5]  Finally, in his affidavit, he agrees with the decision to terminate her because plaintiff allegedly failed to back him up.  (Id. at ¶¶ 14, 21)  In his deposition, he says that when he heard that Sgt. Campbell, whom she has now married, was mad at her for not backing him up, he told her that he was not mad at her and that everything was alright.  (Austin Dep. p. 16)

Charles Campbell, plaintiff's husband and a sergeant with the SPPD, on the other hand, testified in his deposition that Austin has told him "numerous times that [plaintiff] didn't do anything

---

[5]This discrepancy may not be inconsistent, inasmuch as plaintiff herself states that she did not immediately begin the search but, instead, repositioned her car until she was told to exit it.

wrong. He told me that she has not done anything different than any officer in this department has done." (Campbell Dep. 70) Campbell also claimed that Austin told him that Klingenschmidt and Mercer asked him for the memo and also made statements that "they" were out to fire plaintiff during her 60-day probation period. (Id. pp. 144-145, 147-148) Plaintiff confirms in an affidavit that she heard Austin tell Campbell she did not do anything wrong and that Klingenschmidt made Austin write the memo. (Pl.'s Aff. ¶ 31)

Following Austin's submission of the memo to him, Klingenschmidt then prepared an additional memo to Galloway dated April 11, 2002. In it, he set out summary versions of the incidents that occurred on October 10, 2000, September 10, 2001, and April 4, 2002 and described them all as "refusing to assist officers in high-risk situations." (Galloway Dep. Ex. 55) The exact text of his memo is as follows:

> On 4/4/02 at about 11:30pm Officer Austin was involved with a vehicle chase that ended up in a foot pursuit from the rear of the Pink Palace. Officer Weischedel was the closest officer to officer Austin during the foot chase. In fact Officer Weischedel drove past Officer Austin and the suspect on W. Indiana Ave. between S. Stephens St. and S. Henley St. Officer Weischedel made no attempt to exit her patrol vehicle and assist Officer Austin in the apprehension of the suspect. Instead Officer Weischedel drove to the intersection of S. Henley and W. Indiana Ave. and turned right, going south on Henley St. to W. Illinois Ave. were she still didn't exit her vehicle to assist. This is not the first time Officer Weischedel has not assisted another officer in need of help. Officer Austin was in need of assistance since his flashlight stop working and his radio was not working. Officer Weischedel knew that Officer Austin's radio was not working properly.
>
> On 9/4/01 Officer Weischedel (White) was involved with another situation where she was the first police unit to encounter armed burglary suspects on Aiken Rd. She

-14-

waited for another unit to arrive for backup and when
Sgt. Polidori arrived he exited his patrol vehicle and
the suspects ran on foot. He gave chase while Officer
Weischedel stayed in her car and drove off while losing
site of Sgt. Polidori. When questioned Officer
Weischedel said that she was going to get ahead of the
suspect to help apprehend them. Lt. Burgess counseled
her in reference to this incident about how the suspects
could have ambushed Sgt. Polidori and no one would know
for a while. This was another issue of Officer Safety.
When questioned why she didn't' exit the vehicle when
Sgt. Polidori did she said that she couldn't catch them
by running.

On 10/10/00 Officer Weischedel (White) while in the Field
Training Program and working with FTO Sgt. Polidori was
involved with another incident of her not helping another
officer that was involved with a resisting suspect.
Officer Weischedel (White) and Sgt. Polidori were
dispatched to a disturbance at 1085 W. Massachusetts Ave.
The call turned out to be a domestic assault where the
suspect assaulted the female subject. When Sgt. Polidori
told Officer Weischedel (White) to keep the suspect back
while he spoke with the female she did not keep the
suspect away from Sgt. Polidori while he was trying to
get the story of what happen. Officer Hogan arrived as
Sgt. Polidori placed the suspect under arrest. The
suspect resisted and the officers were assaulted.
Officer Weischedel did not attempted to assist the
officers in getting the suspect under control. Sgt.
Polidori called for her help but Officer Weischedel did
nothing but stand back from their location. When Sgt.
Polidori and Officer Hogan finally got control of the
suspect Sgt. Polidori again called Officer Weischedel
(White) to help get the suspect cuffed. Officer
Weischedel hesitated, and then came over to help get the
suspect handcuffed.

As the Field Training Coordinator I was contacted about
this incident and came in and spoke with her about it
with Sgt. Polidori. Officer Weischedel said that she
understood.

It is my recommendation that Officer Weischedel needs
disciplinary action taken against her for her refusing to
assist officers in high-risk situations. This is a real
concern to me when one of my officers is put at risk of
injury while another officer is there and in good
physical condition and should be able to render
assistance to a fellow officer. Officer Weischedel in
the last physical fitness review finished in the top 10

-15-

in the department with the best times in the POPAT. [sic]

Galloway did not make any independent investigation into any of the events described in Klingenschmidt's memo. He did have conversations with Klingenschmidt regarding the incidents, but these described what was already in the memo. (Galloway Dep. pp. 165-166) Based on the memo and conversations, Galloway wrote a memorandum to the Town Manager recommending termination based on the three incidents cited in the Klingenschmidt memo. He added to it by saying that on April 4, 2002, plaintiff drove past the officer and suspect running down the side of the road and instead of exiting to assist, drove on for several blocks and only exited when ordered to do so by a Lieutenant. (Pl.'s Ex. 6) The recommendation was approved by the Town Manager on April 19, 2002.

## II. Plaintiff's Claims

Plaintiff's first claim for relief alleges that the Town of Southern Pines, acting through the individual defendants, Nick Polidori, and other employees, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. because it "took adverse employment actions against the Plaintiff," did this at a time when she was meeting legitimate expectations, did not take similar actions against male employees, and filled her position with a male. (Amended Compl. ¶ 31) Unfortunately, the crucial "adverse employment actions" are not specifically identified. The first claim for relief also alleges that the Town, again acting through the individual defendants and other police officers, retaliated against plaintiff for complaining about being

-16-

discriminated against based on her gender and for filing the charge with the EEOC.  (Id. ¶ 32)  Plaintiff does not specify the retaliation.

Plaintiff's second claim for relief alleges that the individual defendants and other police officers violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, by depriving her of "civil and constitutional rights" while acting under color of state law. (Id. ¶ 41)  She identifies these rights as her "Fourteenth Amendment right to equal protection under the law, due process and the rights secured by 42 U.S.C. § 2000e et seq. [sic]" (Id. ¶ 43) She also claims that the persons violating her rights did so knowingly, that the Town is vicariously liable and showed deliberate indifference to and tacit authorization of the discriminatory conduct, and that the discrimination was a wide-spread and accepted pattern of behavior.  (Id. ¶¶ 44-47)  She alleges "illegal discriminatory and retaliatory practices," but does not identify them.  She seeks attorney fees, back and front pay, and compensatory damages from the Town for the Title VII violations, attorney fees and actual damages from the Town for the § 1983 violations, and attorney fees and actual and punitive damages from the individual defendants for the § 1983 violations. (Id. Prayer for Relief)  Defendants have moved for summary judgment on all of plaintiff's claims.

-17-

### III. Discussion

#### A. Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. <u>Pachaly v. City of Lynchburg</u>, 897 F.2d 723, 725 (4th Cir. 1990). When opposing a properly supported motion for summary judgment, the party cannot rest on conclusory statements, but must provide specific facts, particularly when that party has the burden of proof on an issue. <u>Id</u>. "The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, <u>in the form of admissible evidence</u>, that could carry the burden of proof of his claim at trial." <u>Mitchell v. Data General Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). A mere scintilla of evidence will not suffice. Rather, there must be enough evidence for a jury to render a verdict in favor of the party making a claim. A few isolated facts are not sufficient. <u>Sibley v. Lutheran Hosp. of Maryland, Inc.</u>, 871 F.2d 479 (4th Cir. 1989).

#### B. Title VII Claims

Title VII makes it unlawful for an employer to discharge or "otherwise to discriminate" against an employee "because of" his or her sex. 42 U.S.C. § 2000e-2(a)(1). It is illegal for gender to

-18-

be a "motivating factor" behind an employment practice even if other legitimate factors would have produced the same result. 42 U.S.C. § 2000e-2(m). Title VII also prohibits retaliation, i.e., discrimination because the employee has "opposed any practice made an unlawful employment practice" by Title VII or made a charge under Title VII. 42 U.S.C. § 2000e-3(a). Plaintiff claims that the Town, through its employees in the SPPD, violated these statutes.[6]

Plaintiff can establish her Title VII claims in two ways. She can prove them through direct proof or through presumptions by using the burden-shifting method set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

---

[6]The Town asserts in its briefs that it cannot be held liable for the actions of Galloway and Klingenschmidt because the Town Manager was the person who made the final decision to terminate plaintiff's employment. It believes that it can only be held liable for the Manager's actions. However, an employer's liability under Title VII is not limited to the actions of ultimate decisionmakers. Instead, it is "guided by agency principles." <u>Hill v. Lockheed Martin Logistics Management, Inc.</u>, 354 F.3d 277, 287 (4th Cir. 2004). An employer is not vicariously liable for the actions of all of its employees, but is generally liable "for the acts of its employees holding supervisory or other actual power to make tangible employment decisions." <u>Id</u>. Such employees are considered decisionmakers for Title VII purposes where they make recommendations that are merely rubber stamped by a superior who is the formal decisionmaker. Liability turns on the actions of supervisors that "possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker." <u>Id</u>. at 291. Were the law otherwise, employers could use uninformed and unbiased supervisors as formal decisionmakers to shield themselves from liability for the actions of the biased supervisor-in-fact. <u>Id</u>. at 290. On the other hand, an employer is not liable for the actions of a person who has no disciplinary authority and does not make the employment decision, even if that person had a role in the process. <u>Id</u>.

Here, Galloway and Klingenschmidt were plaintiff's supervisors. Klingenschmidt made a recommendation of discipline which, without further independent investigation, was turned into a recommendation of termination by Galloway. This recommendation was approved by the Town Manager, also without independent investigation. This makes Galloway's and Klingenschmidt's recommendations, either alone or together, the effective decision of the Town Manger and, hence, the Town.

Plaintiff does not argue that she has direct evidence to prove gender discrimination or retaliation. Instead, she relies on the McDonnell Douglas proof scheme. The Court will now employ this test for evaluating her discrimination and retaliation claims.

## 1. Gender Discrimination

Plaintiff contends that she was terminated for using her police vehicle to drive ahead of suspects, while male officers who engaged in the same activity were not.[7] This is a claim of disparate treatment. Under the rebuttable presumption, burden-shifting model, plaintiff must first establish a prima facie case. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-511, 113 S.Ct 2742, 2748-49, 125 L.Ed.2d 407 (1993) (citing McDonnell-Douglas at 802, 93 S.Ct. at 1824.) To establish a prima facie case in support of this theory, she must show that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, and (3) similarly situated officers not in the same protected class were not subjected to any adverse action. See, e.g., Carter v. Ball, 33 F.3d 450, 461 (4th Cir. 1994). Plaintiff can proceed even if she was punished for actions that could be described as misconduct. The key is whether persons not in the protected class engaged in similar misconduct and were not

---

[7]Plaintiff's complaint is susceptible of being read to include other bases for her gender discrimination claim. In fact, defendants briefed some. However, in her response, plaintiff advances only her termination as an adverse action motivated by gender. (Pl.'s Brf. p. 10 § X.) For this reason, the Court concludes that she either intentionally abandoned the other possible bases for her claim or that she never intended to allege them in the first place. The Court will address only her termination as a possible adverse employment action.

-20-

punished.[8]  <u>Abasiekong v. City of Shelby</u>, 744 F.2d 1055, 1057 (4th
Cir. 1984).  If plaintiff is able to do this, the Town must then
show that there was a valid reason for any actions it took
regarding her.  <u>Hicks</u>, 509 U.S. at 510, 113 S.Ct at 2742.  If such
a reason is proffered, plaintiff then has to demonstrate that the
apparently valid reason was actually a pretext for illegal
discrimination.  <u>Id</u>.

The Town does not dispute the fact that, as a female,
plaintiff is in a protected class.  It also concedes that her
termination was an adverse employment action for Title VII
purposes.  (Def. Brf. p. 23)  The Town's only challenge is to the
disparate treatment element of her prima facie case.  In the brief
supporting summary judgment, the Town phrases the argument as being
that plaintiff cannot prove her prima facie case because she failed
to meet her employer's reasonable expectations of employment.
While meeting legitimate expectations is an element in certain
Title VII cases, the elements of a <u>McDonnell Douglas</u> analysis vary
according to the exact nature of the claim made.  <u>Moore v. City of
Charlotte, NC</u>, 754 F.2d 1100, 1105 (4th Cir.), <u>cert</u>. <u>denied</u>, 472
U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).  Where a
plaintiff alleges differential or disparate discipline, the case
usually cannot be resolved by focusing attention on the "legitimate

---

[8]Plaintiff splits her argument into two theories.  One is based on the
assumption that driving ahead of suspects is acceptable conduct, and the other,
that it is misconduct.  Either way, plaintiff's claim succeeds or fails based on
whether or not she was treated the same as male officers who engaged in
substantially the same actions.  It does not matter how the parties label those
actions.

expectations" element. See, e.g., Taylor v. Virginia Union University, 193 F.3d 219 (4th Cir. 1999), cert. denied, 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000), abrogated on other grounds, Desert Palace Inc. v. Costa, 539 U.S. 90, 97-101, 123 S.Ct. 2148, 2153-55, 156 L.Ed.2d 84 (2003); Carter supra; Moore supra.[9] This is because where disparate discipline is alleged, an employer's expectations are established by the behavior it accepts from employees not disciplined. Therefore, if a plaintiff shows that she acted in substantially the same manner as those employees, the employer's expectations have necessarily been met. This is particularly true where examples are available for direct comparisons and the defendant does not point to any defined policy concerning the conduct in question.

The Town's reply brief does argue that plaintiff has not submitted any evidence to support a finding of disparate discipline. Therefore, the Court must decide whether plaintiff has submitted sufficient evidence to establish a prima facie case of gender discrimination.

Of the three incidents of misconduct used to justify plaintiff's firing, the last two involved using a patrol car to drive ahead of a suspect, rather than engaging in a foot chase. Plaintiff contends that male officers frequently used patrol cars to drive ahead of suspects that were being chased on foot by fellow

---

[9]Defendants' citation of Wainwright v. Carolina Motor Club, Inc., (No. 1:03CV01185, 2005 WL 1168463 (M.D.N.C. April 27, 2005), is inapposite because that case did not involve differential discipline. In fact, the only such evidence tended to show that other employees were subjected to the same standards as the Wainwright plaintiff. Id. at *9 n.10.

officers.  (Galloway Dep. Ex. 1, 3, 4; Campbell Dep. pp. 199-203, 205-217, 249-253)  In fact, there is testimony that this is a common practice in the SPPD.  (Campbell Dep. p. 217)  Plaintiff cites a number of examples, some but not all of which are substantially similar to the incidents for which she was terminated.  While exact symmetry between plaintiff's situation or actions and those of others is not required, they must be materially similar.  See generally Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 351 (4th Cir. 1994)(jobs compared on equal pay claim must be "substantially similar"); Moore, 754 F.2d at 1104-05 (misconduct must be of "comparable seriousness" in disparate discipline comparison).  It is the task of the Court to assess the relative similarity of conduct or misconduct relied on by the parties at summary judgment.  Moore, 754 F.2d at 1107.

For comparable incidents, Sergeant Campbell testified that early one evening he and Austin approached a person wanted on some warrants.  As the officers exited their patrol vehicles, the person ran and Campbell pursued on foot.  Although he was already out of his car, Austin returned to his car and drove for a three block radius around a house to cut the suspect off.  This occurred after plaintiff had been terminated.  Campbell related that he and Austin spoke about the use of the tactic afterwards, with Austin saying "I got back in the car because that's something we do" and reiterating that plaintiff had done nothing wrong during the April 4th incident.  Klingenschmidt was the supervisor at the time, was responsible for monitoring radio traffic, and was at least generally aware of the

-23-

chase. (Campbell Dep. pp. 199-203) The incident is only dissimilar to the two for which plaintiff was terminated in that it occurred during daylight. Also, in one of plaintiff's incidents, shots were fired. Nevertheless, no one has explained how these factors would affect the analysis.

In another incident, which occurred prior to plaintiff's termination, Campbell chased a suspect on foot for two to three blocks through yards, while Klingenschmidt and officers Bloome and Garner stayed in their cars and drove ahead. The chase ended when Garner's vehicle hit the suspect, who was trying to cross a road fifteen feet in front of Campbell. (Id. pp. 205-210) Likewise, at another time, Campbell chased an armed suspect on foot and at night while Garner drove ahead and cut him off with his car. (Id. pp. 211-212) Campbell also stated that he personally has used his patrol car to get ahead of suspects on about 40 occasions over an eight year period and that he has seen several other officers do it as well. (Id. pp. 215-217, 250-253) So far as the record reflects, none of the officers were ever terminated, suspended, verbally warned, or otherwise disciplined for using patrol cars to get ahead of suspects.

The Town responds to these episodes by asserting that:

plaintiff was not disciplined because the activity she engaged in was "per se" inappropriate. Rather plaintiff was disciplined, because the undisputed conclusion of her supervisors was that the activity she chose--i.e. driving in her car rather than pursuing on foot--was not a reasonable method of assisting her fellow officer in the particular situation.

-24-

(Def. Reply p. 3) Unfortunately, the Town does not cite to evidentiary support for its contention that a distinction was made by plaintiff's supervisors between her particular actions and the use of cars to cut off suspects in general. Nor does the Town explain how plaintiff's conduct materially differed from that of other officers who drove ahead of foot chases to cut off suspects. Instead, it relies on the proposition that plaintiff's supervisors had "the opinion" that she acted improperly and argues that this opinion cannot be second-guessed. From this, it concludes that she was not meeting the legitimate expectations of her employer. This argument falters because, as noted above, when there is no prior established policy in a disparate treatment case, an employer's "employment expectations" are established by the substantially similar conduct it tolerates by other employees outside the "protected" group. The "opinions" of the supervisor are not determinative.

Next, plaintiff points out that according to defendants, her actions during the three incidents listed in Klingenschmidt's memo to Galloway made other officers "more vulnerable to physical harm" because plaintiff "failed to assist" them. (Galloway Dep. Ex. 57) And, plaintiff does not dispute that leaving fellow officers more vulnerable to harm by failing to assist them would be of great concern to a police department. However, she presents a police report, attached to Galloway's deposition as Exhibit 5, where on August 10, 2003, defendant Burgess was driving past a pub at 2:45 a.m. Upon hearing a woman's voice and then hearing her say

something about calling the police, Burgess looked in the direction of the pub and saw a crowd of ten people gathered. Suspecting a fight, he radioed Officer Robert Williams to check it out. Burgess then drove to the police department, intending to return after he retrieved his flashlight. Before Burgess returned, Williams radioed that there was no fight and the people were dispersing. (In fact, there had been an assault that left a person with head injuries that later resulted in him being hospitalized in intensive care.)

Addressing Burgess' decision to drive to the station to retrieve his flashlight rather than immediately assist Officer Williams in investigating a possible fight, the Town states that Burgess was not similarly situated to plaintiff because "Burgess was a lieutenant with the SPPD," he had authority to assign tasks to subordinates like Williams, and he "was returning to the police station after responding to a fight call." (Def. Reply p. 5) While these are certainly differences between Burgess and plaintiff, the Town has not explained their relevance to the issue at hand. The Town has not provided evidence that Burgess' action could not or did not expose the other officer to danger, nor shown how Burgess' status as a supervisor or the fact that he was returning from a call may have affected his duty to assist fellow officers. Therefore, it has not presented evidence which provides a meaningful distinction between Burgess and plaintiff.

Viewing this incident in the light most favorable to plaintiff, a jury could easily conclude that Burgess left Williams

(not to mention the person being assaulted) alone in a volatile and dangerous situation in order to retrieve a flashlight. Such a finding would make the incident of comparable seriousness to the last two of the alleged misconducts engaged in by plaintiff. Yet, the record does not show that Burgess was disciplined in any way for his actions.

Even more factually similar are the actions of Mercer and Klingenschmidt during Austin's chase on April 4, 2002. According to the currently undisputed facts in the record, Mercer and Klingenschmidt were the first officers on the scene when Carlton Terry exited his truck at the Pink Palace and began running. (Austin Dep. Ex. 5) Austin was close behind. Mercer immediately gave chase, but, so far as the record indicates, Klingenschmidt did not assist him in any way. (Id.) Instead, he stayed with Terry's abandoned vehicle, apparently to secure and/or search it. Now, it is possible that policy or procedure required him to do so, but the point is that defendants have not presented any evidence of this. It is also possible that Klingenschmidt knew Austin was close behind and would assist Mercer in the foot chase. But again, this is not clear. The Court is left with a scenario where Klingenschmidt stayed with the truck and squad cars for some amount of time as Mercer and then Austin chased Terry alone.

As for Mercer, he chased Terry for a short distance before Austin arrived. However, Austin testified that, almost as soon as he saw Mercer and the suspect, Mercer stopped chasing and began

Case 1:03-cv-00892-RAE   Document 55   Filed 07/28/05   Page 27 of 51

banging on his flashlight with his hand.[10]  (Id. p. 76)  Apparently,
Mercer returned to Klingenschmidt's location and also tried to
contact Austin on the radio to get his location.  Later, he and
Klingenschmidt drove to and by plaintiff and Austin's location
while looking for the suspect in their car.  (Id. p. 83)

The Town asserts that Mercer did assist because he chased
Terry and only quit chasing when his flashlight stopped working.
However, abandoning the chase just as Austin joined can hardly be
classified as "assistance," and no reason is given as to why Mercer
did not join Austin in the chase.  And, as noted previously, the
currently uncontradicted testimony in the record is that a
malfunctioning flashlight is not ordinarily a reason for an officer
with the SPPD to end a chase.

Finally, the Town again states that plaintiff was a
probationary patrol officer, while Mercer and Klingenschmidt were
supervisors.  However, it fails to explain the relevance of this
fact by showing that only probationary employees and not
supervisors have a duty to assist other officers.  The Town also
points to the fact that Austin voluntarily complained about
plaintiff, not Klingenschmidt and Mercer.  Nevertheless, Austin's

_____

[10]Despite the apparent importance given by Burgess and Mercer to the
presence and/or functioning of flashlights, Campbell testified that he has never
been told not to chase a suspect without a functioning flashlight.  He also
testified that he had never seen anyone abandon a chase due to a flashlight
malfunction unless they ran into woods and lost sight of the suspect.  Even then,
officers "generally run for a distance until they just can't go any further."
(Campbell Dep. p. 263)  The Town has not pointed to any contrary policy or
procedure and has not cited testimony showing that the lack of a functioning
flashlight obviates the need to investigate a possible fight, chase a suspect,
or assist another officer.  Moreover, the Town fails to explain why Mercer did
not follow Austin.

-28-

complaint was initially pursued by Mercer and Klingenschmidt, who were both well aware of the similarities and dissimilarities of their actions relative to plaintiff's. Still, plaintiff was disciplined, they were not, and the Town has not yet given a logical reason for this by explaining how their actions differed from plaintiff's.

The Court finds that plaintiff has established the elements of a prima facie case of disparate discipline based on gender. She has given examples of where males engaged in similar conduct and were not disciplined. The Town has not shown either that some males were disciplined or that other females were not disciplined in order to dispel the notion that plaintiff was disciplined because of her gender.

The Court is aware that plaintiff was discharged because of three incidents and that plaintiff only gives examples of isolated incidents as to other officers. However, the Town has not offered evidence that anyone other than plaintiff was disciplined, much less even warned, concerning using a patrol car instead of chasing on foot.[11] Nor has it shown that a cumulation of "misconduct" by

---

[11]It is true that plaintiff has not shown that a male officer failed to come to the assistance of an officer struggling with a suspect. It is also true that in the second incident, shots were fired and plaintiff waited and let Sergeant Polidori initiate the chase. However, the first incident occurred while plaintiff was a trainee. For the second incident, she was not disciplined for waiting, nor was the fact that shots were once fired mentioned. It appears that the termination mainly relied on her using her car to head off a suspect instead of joining a foot chase with another officer. It will be for a jury to decide whether her treatment was materially different from the way male officers were treated. Her case has weaknesses because the first and possibly the second incident may differentiate her from the male officers she uses as examples. On the other hand, she has shown that the Town does not have a chase policy and only
(continued...)

plaintiff was the reason.  <u>See</u> n.10.  Therefore, the Town has not

met its burden to give a "permissible rationale for treating

[plaintiff] differently."  <u>Moore</u>, 754 F.2d at 1106.  A defendant's

burden at the second stage of the <u>McDonnell Douglas</u> analysis in a

disparate discipline case cannot be met "by merely restating [the]

offense for which a plaintiff was disciplined."  <u>Id</u>.  Instead, a

defendant must address the contested issue by giving "insight into

the discretionary factors underlying defendant's decision to

[treat] two individuals differently."  <u>Id</u>.  For these reasons, the

Town's motion for summary judgment on plaintiff's claim of gender

discrimination under Title VII will be denied.

2.  <u>Retaliation Claims</u>

The Town also seeks to have plaintiff's claim of retaliation

dismissed.  For that claim, plaintiff advances two separate

theories.  She believes that both her evaluation (i.e., "needs

improvement") and her eventual termination were retaliation for her

various complaints about gender discrimination.  To establish a

prima facie case of retaliation, plaintiff must show that (1) she

engaged in a protected activity, (2) she suffered an adverse

employment action, and (3) circumstances indicate that the adverse

action was causally connected to plaintiff's protected activity.

<u>Von Gunten v. Maryland</u>, 243 F.3d 858, 863 (4th Cir. 2001).  Again,

if plaintiff succeeds in meeting this burden, the Town must advance

a nondiscriminatory reason for its actions and plaintiff will then

---

[11](...continued)
she has been disciplined at a time when she had complained of gender
discrimination.

have a chance to show that the reason is a pretext. <u>Ross v. Communication Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir. 1985), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

The Town does not contend that plaintiff's complaints of gender discrimination and the charge filed with the EEOC do not constitute protected activity under Title VII and does not deny that plaintiff's termination was an adverse employment action. It does argue that her unfavorable evaluation was not an adverse action and also claims that plaintiff cannot demonstrate the necessary causal connection between her protected activities and either the evaluation or her termination.

Addressing the evaluation first, there is sufficient evidence to conclude that it was an adverse employment action. In order to qualify as an adverse employment action, an event must "'adversely affect[] the terms, conditions, or benefits of the plaintiff's employment.'" <u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 375 (4th Cir.), <u>cert</u>. <u>denied</u>, ___ U.S. ___, 125 S.Ct. 423, 160 L.Ed.2d 323 (2004)(quoting <u>Von Gunten</u> <u>supra</u>). Examples include decreases in compensation, job title, level of responsibility, and opportunities for promotion. <u>Id</u>. at 376. Here, plaintiff alleges that the negative evaluation resulted in a denial of a pay increase. (Pl.'s Brf. p. 15) Such a denial is an adverse employment action. <u>See</u>, <u>e.g.</u>, <u>Gillis v. Georgia Department of Corrections</u>, 400 F.3d 883 (11th Cir. 2005)(three percent rather than five percent raise based on an annual evaluation was adverse

-31-

employment action); <u>Fierros v. Texas Department of Health</u>, 274 F.3d 187 (5th Cir. 2001)(denial of merit pay increase was adverse employment action).

The Town does not dispute that plaintiff's unfavorable evaluation cost her a pay increase, and there is evidence in the record to support her contention.[12]  What the Town asserts is that the evaluation cannot be considered an adverse employment decision because plaintiff filed a grievance over the evaluation and the grievance process was not completed before plaintiff was terminated.  From this, it concludes that the evaluation never became a "final" decision.  However, the termination made the evaluation final because it ended the grievance process.  During the grievance process, plaintiff was ineligible for the pay increase between the time that the evaluation was completed and the time that she was terminated.

Turning now to the final element of plaintiff's prima facie case, the Court finds that plaintiff does have sufficient evidence to establish this element as well.  She must show that her protected activities could be the cause of her poor evaluation and her termination.  However, this burden is "less onerous" at this stage of the <u>McDonnell Douglas</u> analysis.  <u>Williams v. Cerberonics,</u>

_____

[12]The evaluation itself is labeled a "Promotion Review" and the timing of the evaluation suggests that it was conducted in conjunction with the scheduled end of a six month probation period that followed her promotion to Patrol Officer I in June of 2001. (Galloway Dep. Ex. 46; Dreher Aff. Ex. A pp. 6-9).  Employees of the Town are allowed to receive a raise when they satisfactorily complete a probationary period.   (Dreher Aff. Ex. A. p. 7)   Plaintiff's evaluation recommended that her probation period be extended for 60 days.  (Galloway Dep. Ex. 46)

Inc., 871 F.2d 452, 457 (4th Cir. 1989).  Nothing else appearing, a showing that an employee had knowledge of a protected activity and an adverse action in close temporal proximity thereto, can alone establish a prima facie case of retaliation.  Carter, 33 F.3d at 460 (prima facie case existed where five and one half months separated EEOC complaint and adverse action); Williams supra (prima facie case established where three and a half months passed).

Here, plaintiff first complained of gender discrimination to Burgess on August 29, 2001.  Then, on September 25, at Galloway's request, she submitted her allegations of gender discrimination in writing.  Her evaluation was submitted by Burgess to Galloway and approved by Galloway in mid-February of 2002.  Therefore, only four and one half months passed between plaintiff's written complaints of gender discrimination and her negative evaluation.  This short time period can be used by plaintiff to satisfy her burden in the present case as to her evaluation.  Likewise, mere weeks passed between plaintiff's grievance hearings, her filing of a charge with the EEOC, and her termination.  This too is sufficient to meet plaintiff's burden as to her prima facie case.

On this record, plaintiff has established a prima facie case as to both of her retaliation claims.  In response, the Town proffers legitimate non-retaliatory reasons for her evaluation and termination.  As to the evaluation, the Town argues that the evaluation reflected Burgess' honestly held beliefs concerning plaintiff's performance in particular areas of her job.  With respect to plaintiff's termination, the Town continues to assert

-33-

that plaintiff was fired because she failed to provide proper backup to Austin and this was the third time she did not properly assist other officers.

As a consequence of the Town advancing legitimate reasons for its actions, plaintiff must now demonstrate that the proffered reasons are a pretext. Furthermore, while an employer's knowledge of protected activities and a close temporal proximity between protected activities and an adverse employment action can establish a prima facie case of retaliation, it is not enough to overcome an employer's legitimate reason for the adverse action. Carter supra; Williams supra. Instead, a plaintiff must submit proof that the proffered reason is a pretext for discrimination.

Plaintiff fails to point to evidence that her evaluation was retaliation, as opposed to Burgess' honest evaluation of her job performance. While plaintiff discusses the September 4, 2001 incident, it was of minor importance in the evaluation. The incident was only mentioned in one section, and was one of ten items listed in that section. (Galloway Dep. Ex. 46) A dispute over that single item would hardly call the motivation behind the overall evaluation into question.

The only other possibly applicable evidence cited to in plaintiff's brief is a report from Dr. Sue Collins, an expert witness.[13] However, this is not cited in conjunction with

_____

[13]Actually, plaintiff has included expert reports from two experts, Dr. Collins and Kenneth Johnson, in the record. In the fact section of her brief, she notes that these reports are in the record, gives a brief summary of her experts' credentials, and sets out a series of issues that she feels expert
(continued...)

-34-

plaintiff's retaliatory evaluation argument and, even where it is mentioned in the fact section of the brief, it is merely cited to and not discussed.

The report only addresses some of the many criticisms of plaintiff's performance contained in her evaluation. This leaves the others unchallenged. Also, much of the report is aimed at the methodology used in the evaluation, the standards used by the SPPD to evaluate plaintiff, the allegedly inadequate training methods at the SPPD, and Burgess' alleged shortcomings as a supervisor and evaluator. Whatever merit these criticisms may or may not have in a universal sense, they have little or no relevance in addressing the question at issue here, i.e. whether Burgess honestly evaluated plaintiff's performance to the best of his ability using whatever standards were in place or instead used the evaluation as a vehicle for retaliation. Title VII is meant only to protect employees against improper discrimination and retaliation. It is not intended to protect them from poor training, management, or decision making practices.[14]  <u>Anderson v. Westinghouse Savannah</u>

---

[13](...continued)
testimony can help address in this case. However, she does not specify in which areas each of the experts is qualified to render testimony. She also does not tell which expert can address which of these issues she lists. Not only this, but she then hardly cites to the experts anywhere in the discussion portion of her brief and where she does, they do not appear to be of critical importance. At most, they only bolster other evidence or support conclusions that a layman or the Court would seem qualified to make without resorting to expert testimony. (See Pl.'s Brf. pp. 17, 19-20) Because of this, the Court has not relied on the opinions of the experts in reaching its decision in the case.

[14]The report actually helps defendants because male officers were criticized for things such as a lack of confidence, a lack of knowledge of traffic laws, spending too much time on reports, mistakes in reports, poor
(continued...)

River Co., 406 F.3d 248, 272 (4th Cir. 2005)(the court does not sit to rule on the wisdom of an employer's personnel policies); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 281 (4th Cir.), cert. denied, 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 125 (2000)(court does not arbitrate between employees and employers or rule on the wisdom and generosity of management practices).

Other evidence tends to dispel the notion that Burgess was motivated by retaliation. First, problems between plaintiff and Burgess arose well before she initially complained of any sexual harassment. He counseled her on at least three occasions prior to her making a complaint and, in fact, he was discussing what he perceived to be her performance problems when her gender discrimination complaints first arose. (Burgess Aff. ¶¶ 19, 21) Second, immediately upon hearing those complaints, Burgess did not try to hide, discourage, or refute the allegations, but instead reported them to Galloway so that further appropriate action could be taken. He did this even though some of the allegations concerned plaintiff's treatment while assigned to his team. In light of this, it is less likely that Burgess would then retaliate four and a half months later, particularly after the investigation did not conclude that there was any serious wrongdoing on his part. Considering this and the lack of evidence proffered by plaintiff,

---

<sup>14</sup>(...continued)
relationships with fellow officers, poor attitude, and unwillingness to accept new ideas. (Collins Report pp. 52-53) These items are the same as or similar to several of the reasons given for plaintiff's negative evaluation. Similarity of treatment, not good management, is the issue here and the presence of similar criticisms in plaintiff's and other officers' evaluations suggests that no retaliation occurred.

the Town's motion for summary judgment will be granted as to plaintiff's retaliation claim to the extent that it relies on her evaluation.

The Town is not entitled to summary judgment on plaintiff's claim that her discharge amounted to retaliation. As discussed in regard to plaintiff's gender discrimination claim, there are serious issues of disputed facts surrounding the events of April 4, 2002. Viewed most favorably to plaintiff, the evidence shows was treated differently from similarly situated male officers after she complained of discrimination.

There is additional evidence supporting retaliation as well. With respect to the April 4, 2000 incident, Austin redacted his report. Moreover, he allegedly told plaintiff and Campbell that plaintiff did nothing wrong, "they" came to him, and "they" were out to fire plaintiff. If believed, this evidence gives rise to an inference that there was a concerted effort within the SPPD to fire plaintiff for her complaints on the pretext that she did not back up fellow officers.

Finally, Galloway's handling of Klingenschmidt's memorandum also supports this inference. Upon receipt of the memo, which suggested only that plaintiff be "disciplined" and not necessarily that she be terminated, Galloway quickly decided to terminate plaintiff. Before doing so, he did not speak to plaintiff or even Austin and Mercer. In fact, he did not investigate in any way, but instead decided to fire plaintiff based on Klingenschmidt's memorandum.

The decision to terminate an employee without any investigation would ordinarily be a discretionary personnel decision by a manager which, even if unwise or incorrect, cannot be remedied by Title VII. However, the circumstances present in this case would allow a jury to find that it was actually an act of retaliation. First, at the time he made the decision to fire plaintiff, Galloway was fully aware that plaintiff had complained of gender discrimination in August and September of 2001, that her grievance challenging her evaluation also mentioned gender discrimination, and that plaintiff had filed an EEOC charge less than a month before. Second, he was aware of Klingenschmidt's statements to plaintiff at her grievance hearing and that plaintiff viewed the statements as a threat to retaliate. Still, he simply accepted Klingenschmidt's memo at face value.[15]

A jury could conclude that Galloway and the Town treated Klingenschmidt's allegations against plaintiff differently because they created an opportunity to rid themselves of a "disgruntled" employee who had been making complaints and was pursing a charge with the EEOC.

## C. Section 1983 Claims

---

[15]Galloway has investigated when other officers were accused of misconduct. A few months after plaintiff was fired, he investigated the complaints of Officer Lesia McCollough, who reported that a fellow officer was failing to provide her with proper backup on night calls. (McCollough Dep. pp. 19-25)

The Town argues in its reply, but without giving a citation, that the McCollough investigation occurred because the Town was concerned that there might be an issue of discrimination given plaintiff's allegations and the fact that another female officer was complaining. It does not explain why this was a concern at the time when plaintiff first complained and then again after she was fired, but was not a concern at the time she was fired.

In addition to raising Title VII claims against the Town, plaintiff's amended complaint also alleges § 1983 violations against both the individual defendants and the Town. All defendants have requested summary judgment as to all of those claims.

The Town correctly argues it is entitled to summary judgment because it cannot be held liable for the actions of any of the individual defendants. It is well established law that the doctrine of <u>respondeat superior</u> does not apply in cases brought under § 1983. <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 120-121, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992). A town can only be held liable for the actions of employees when it is shown that the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-2038, 56 L.Ed.2d 611 (1978). The Town contends that plaintiff cannot show she was injured by a policy or custom of the Town. The evidence indicates that the individuals acted in contravention of applicable policy and not in accordance with it. (Dreher Aff. Ex. A) Plaintiff fails to show otherwise.

The other way to establish municipal liability is for plaintiff to show that the employees who took adverse actions against her were the actions of Town officials with final policy-making authority. <u>Randle v. City of Aurora</u>, 69 F.3d 441, 447 (10th

Cir. 1995), citing City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); and Wulf v. City of Wichita, 883 F.2d 842, 868 (10th Cir. 1989). In the instant case, none of the three defendants can be said to be such officials. It was the Town Manager who actually made the final decision and he is not a defendant.[16] Moreover, plaintiff has not submitted evidence of the chain of legal authority to determine which official was the final policy-making authority. Randle, 69 F.3d at 448.

The individual defendants request dismissal based on the doctrine of qualified immunity. Government officials are immune from § 1983 claims unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Officials who discriminate on the basis of gender are not entitled to qualified immunity because a reasonable person would have known that such was forbidden well before the events of this lawsuit. Mandsager v. University of North Carolina at Greensboro, 269 F. Supp. 2d 662, 677-78 (M.D.N.C. 2003). The same is true for

---

[16]When an employee has the legal power to make an employment decision, the municipality will likely be held accountable as well. Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995); Wulf v. City of Wichita, 883 F.2d 842, 867-868 (10th Cir. 1989). In that instance, the McDonnell Douglas rebuttable presumption may be used in a § 1983 action. Thompson v. Potomac Electric Power Co., 312 F.3d 645, 649 N.1 (4th Cir. 2002); Rufolo v. Midwest Marine Contractor, Inc., 6 F.3d 448, 450 (7th Cir. 1993), cert granted, judgment vacated, 511 U.S. 1050, 114 S.Ct. 1609, 128 L.Ed.2d 337 (1994); see St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742 n.1, 125 L.Ed.2d 407 (1993).

retaliation against an employee who protests against gender discrimination. <u>Beardsley v. Webb</u>, 30 F.3d 524, 530-31 (4th Cir. 1994).

Defendants do not argue otherwise; but rather, premise their argument on the assumption that plaintiff cannot sufficiently prove her Title VII allegations to move beyond summary judgment. The Court has previously found plaintiff can proceed on two of the three bases for her Title VII claims. That said, merely because plaintiff can proceed with her Title VII claims does not mean she can proceed with her § 1983 claims against the individuals.

Neither plaintiff's complaint, nor her brief, specify the legal basis for her claims against the individual defendants. They did not discharge her. This was done by the Town Manager. Nevertheless, individual liability may be premised on the First Amendment right to speak out on matters of public concern or on the Fourteenth Amendment right to be free from gender discrimination. Here, plaintiff allegedly suffered gender discrimination and made complaints about gender discrimination.

It appears that plaintiff is seeking to assert a claim of retaliatory employment action in violation of a public employee's right to free speech. In this instance, an adverse employment action occurs if the retaliatory conduct would deter an ordinary and reasonable person from exercising First Amendment rights. <u>Constantine v. Rectors and Visitors of George Mason University</u>, ____ F.3d ____, 2005 WL 1384373, at *21 (4th Cir. June 13, 2005)(No. 04-1410). Such a cause of action can be premised, for example, on

-41-

initiating an investigation for an illegal purpose, even though no further adverse employment action is taken. <u>Williams v. Hansen</u>, 326 F.3d 569, 585 n.1 (4th Cir.)(J. King, dissenting)(collecting cases), <u>cert</u>. <u>denied</u>, 540 U.S. 1089, 124 S.Ct. 958, 157 L.Ed.2d 794 (2003); <u>but</u> <u>see</u> <u>Harrington v. Harris</u>, 118 F.3d 359, 366 (5th Cir. 1997), <u>cert</u>. <u>denied</u>, 522 U.S. 1016, 118 S.Ct. 603, 139 L.Ed.2d 491 (1997)(mere criticism of employee does not constitute actionable adverse employment action). Furthermore, even though none of the three individual defendants actually discharged plaintiff, it is possible that they could be liable if it is found that the final decision-maker would not have terminated plaintiff's employment without the intervention of the wrongfully motivated subordinate who initiated the activity leading to the termination. <u>Gilbrook v. City of Westminster</u>, 177 F.3d 839, 854-855 (9th Cir. 1999), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u>, <u>City of Westminster v. Herr</u>, 528 U.S. 1061, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999); <u>Wulf</u>, 883 F.2d at 864. In the instant case, the evidence shows that defendants Burgess and Klingenschmidt conducted an investigation and that defendant Galloway made a recommendation that plaintiff be terminated. Plaintiff claims that the defendants took these actions on the basis of gender bias or retaliation for complaints of gender bias.

In order to proceed under the First Amendment, plaintiff must first show that she engaged in speech relating to a public matter; second, that her interest in First Amendment expression outweighed the employer's interest in efficient operation of the workplace; and third, that there is a causal relationship between the

-42-

protected speech and the retaliatory employment action. Love-Lane
v. Martin, 355 F.3d 766, 776 (4th Cir.), cert. denied, ____ U.S.
____, 125 S.Ct. 49, 160 L.Ed.2d 18 (2004), and cert. denied, ____
U.S. ____, 125 S.Ct. 68, 160 L.Ed.2d 18 (2004).  Speaking out
against gender discrimination is a matter of public concern for
which employers must make accommodation.  Seemuller v. Fairfax
County School Board, 878 F.2d 1578, 1582 (4th Cir. 1989); Konits v.
Valley Stream Cent. High School Dist., 394 F.3d 121, 124 (2d Cir.
2005); Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 168
(6th Cir. 2004).  Consequently, in this case, the Court need only
focus on whether plaintiff has shown a causal relationship between
the speech and the adverse action -- in other words, whether the
protected speech was a substantial factor in the resulting
retaliatory employment action.  Love-Lane, 355 F.3d at 776.

        Because the doctrine of respondeat superior does not apply,
each defendant is only liable under § 1983 based on his own
actions.  Therefore, for § 1983 purposes, Burgess, Klingenschmidt,
and Galloway's actions must be considered separately.  Because
neither party focused their briefing on the legal framework set out
above, the Court's task is not easy.

        Clearly, Galloway is not entitled to summary judgment. He was
intimately involved in the decision to terminate plaintiff.  As
noted above, the fact that he needed approval from other officials
does not absolve him when he was the one who made the
recommendation.  He knew plaintiff had been complaining about
gender discrimination.  Yet, he accepted a report from

-43-

Klingenschmidt which could be viewed as flawed and made no independent investigation. He is not entitled to summary judgment on the § 1983 claim.

Klingenschmidt's situation is slightly different. His attendance at plaintiff's grievance hearing shows that he was aware of plaintiff's grievance concerning her evaluation. The grievance was based partly on gender discrimination and/or retaliation. It was Klingenschmidt who is alleged to have made comments threatening retaliation while at the first grievance hearing. He then drafted a memo recommending that plaintiff be disciplined. As noted earlier, that report could be viewed as flawed. The fact that he recommended only "discipline" and not "termination" does not provide complete protection. Klingenschmidt could be held responsible to the same extent as Galloway if Galloway merely accepted or rubber stamped Klingenschmidt's allegedly biased and improperly motivated report, should the jury so find. Gilbrook, 177 F.3d at 855. There is evidence Galloway did not conduct an independent investigation.

Burgess is in a much different position than Klingenschmidt and Galloway because of the Court's earlier conclusion that plaintiff does not have enough evidence to base a Title VII claim on events associated with her evaluation. Burgess was far less involved than the other two defendants in her termination. While he did attend plaintiff's grievance hearings and met with Galloway and Klingenschmidt before the first one, he did not preside over the hearings and is not reported to have made any statements that

-44-

could be considered warnings and threats. Neither the exact nature of the meeting with Galloway and Klingenschmidt nor the extent and content of Burgess' participation in that meeting is in the record before the Court. Finally, Burgess had nothing to do with the events of April 4, 2002. Plaintiff states in her response that Burgess "contributed" the September 4, 2001 incident to Klingenschmidt's memorandum. (Pl.'s Brf. p. 34, citing Klingenschmidt Dep. p. 86) It is highly questionable whether, if correct, this alone would be enough to create liability on Burgess' part. However, it does not matter because Klingenschmidt actually testified that he was unsure whether he got the information from Burgess or from plaintiff's personnel file. (Klingenschmidt Dep. p. 86) Consequently, there is no evidence affirmatively stating that Burgess played any part in creating the memorandum or in the termination decision that followed. For all of these reasons, defendants' motion for summary judgment will be granted as to Burgess regarding plaintiff's retaliation claim under § 1983.

Plaintiff also raises allegations to support a § 1983 claim that defendants violated the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause protects public employees from gender based employment discrimination. Knussman v. Maryland, 272 F.3d 625 (4th Cir. 2001). At least generally, the standards for proving Title VII discrimination and the discrimination necessary to maintain a § 1983 equal protection claim are the same. Hildebrandt v. Illinois Department of Natural Resources, 347 F. 3d 1014, 1036 (7th Cir. 2003); Smith v. City of

-45-

<u>Salem, Ohio</u>, 378 F.3d 566, 577 (6th Cir. 2004). However, as previously mentioned, § 1983 liability is based on individual responsibility, not Title VII agency principles. For this reason, the Court must again analyze Galloway, Klingenschmidt, and Burgess separately to see whether there is evidence that they personally caused, participated in, facilitated, condoned, approved, directed, or turned a blind eye to gender discrimination. <u>Hildebrandt</u>, 347 F.3d at 1039 (citing <u>Gentry v. Duckworth</u>, 65 F.3d 555, 561 (7th Cir. 1995)).

As discussed in the portion of this opinion dealing with plaintiff's Title VII gender discrimination claim against the Town, Galloway and Klingenschmidt were directly and personally involved in plaintiff's firing, even if they did not make the final termination decision. According to plaintiff's evidence, Klingenschmidt drew up the report on which the termination was based and Galloway acted it on it without further investigation. The Town Manager then approved Galloway's recommendation of termination without further independent investigation.

Galloway and Klingenschmidt are not absolved of liability merely because the Town Manager did not act with discriminatory intent, nor had evidence which should have led him to inquire as to whether the two officers submitted biased reports. <u>See</u> <u>Back v. Hastings On Hudson Union Free School Dist.</u>, 365 F.3d 107, 126 (2d Cir. 2004). Nevertheless, because Galloway and Klingenschmidt did not actually terminate plaintiff's employment, plaintiff must demonstrate a sufficiently direct causal link between defendants'

-46-

actions and her termination.  <u>Back</u>, 365 F.3d at 125-126.  The defendants must have played a meaningful role in the process.  <u>Id</u>. Being her immediate supervisors and making the challenged recommendations which were passed up the line and appear to be the sole basis for the actions taken normally meets this test.  <u>Id</u>. Defendants fail to show a superseding or intervening cause.  <u>Id</u>.[17] Therefore, plaintiff will be able to proceed against Galloway and Klingenschmidt on her § 1983 equal protection claim.

Again, plaintiff's case against Burgess is a different story. As with the free speech claim, even if plaintiff can prove that her firing was based on gender discrimination, her evidence does not show a sufficiently direct involvement by Burgess in her termination.  Nor has she produced sufficient evidence to demonstrate that his evaluation of her was based on her gender. Therefore, summary judgment will be granted as to Burgess on all of plaintiff's § 1983 claims.

Defendants raise two further § 1983 arguments which need not detain the Court for long.  In their reply brief, defendants cite to <u>Great American Federal Sav. & Loan Assoc. v. Novotny</u>, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), and <u>Hughes v. Bledsoe</u>, 48 F.3d 1376, n.6 (4th Cir.), <u>cert</u>. <u>denied</u>, 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995), contending that a plaintiff cannot sue individuals under § 1983 based on actions which would also

_____

[17]Klingenschmidt, of course, only recommended discipline and not termination, but apparently did not exclude termination.  On these facts, the Court cannot say that a jury could not find Klingenschmidt played a sufficiently meaningful role in the termination, so that Galloway's recommendation was not a superseding cause.

constitute violations of Title VII. Such matters may not be first raised in a reply brief. Local Rule 7.3(h). Further, it is an incorrect statement of Fourth Circuit law, which was clarified in <u>Booth v. Maryland</u>, 327 F.3d 377, 382-83 (4th Cir. 2003). A plaintiff may use both § 1983 and Title VII.

Defendants next contend that punitive damages are not appropriate in this case. Punitive damages cannot be awarded against municipalities or official capacity defendants. <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 252-71, 101 S.Ct. 2748, 2752-62, 69 L.Ed.2d 616 (1981). In any event, plaintiff only seeks such damages from the individual defendants under § 1983.

Punitive damages are available under § 1983 where a defendant is motivated by an evil intent or shows a reckless or callous indifference to a plaintiff's rights. <u>Smith v. Wade</u>, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Plaintiff has put forward evidence from which a jury could find intentional discrimination and retaliation. In discussing 42 U.S.C. § 1981a, a statute containing a similar, if not functionally identical, standard for punitive damages, the Fourth Circuit noted that the cases meeting the standard for "malice" or "reckless indifference" are a subset of those with intentional discrimination. <u>Lowery v. Circuit City Stores, Inc.</u>, 206 F.3d 431, 441-442 (4th Cir.), <u>cert</u>. <u>denied</u>, 531 U.S. 822, 121 S.Ct. 66, 148 L.Ed.2d 31 (2000). Not all cases involving intentional discrimination will meet the standard for punitive damages, such as where an employer is not aware of the relevant federal statutes, where an employer believes the

-48-

discrimination is lawful, where the underlying theory of discrimination is novel, or where an employer reasonably believes its discriminatory acts meet a defense or statutory exception. Id., (citing Kolstad v. American Dental Assoc., 527 U.S. 526, 119 S.Ct. 2118, 2125, 144 L.Ed.2d 494 (1999)).

Galloway and Klingenschmidt have not claimed that they did not know of Title VII and its requirements. They claim only that their actions did not violate it. This is not sufficient to strike the punitive damages claim at this point.

Galloway seeks to avoid punitive damages on the grounds that he consulted a Town attorney before firing plaintiff. Defendants rely on Angell v. Leslie, 832 F.2d 817, 821 (4th Cir. 1987), to demonstrate that acting under the advice of an attorney can defeat a claim for punitive damages. It must first be noted that the punitive damages issue in Angell was decided on other grounds. This makes the statement in Angell concerning attorney advice dicta. On the other hand, it makes sense that attorney advice might bar punitive damages in some cases if the advice caused a defendant to have a reasonable belief that his discriminatory acts actually complied with the law. This would be akin to the examples described in Lowery and Kolstad.

Assuming for the sake of argument that attorney advice could potentially provide an affirmative defense to punitive damages claims in § 1983 cases, Galloway would still need to submit adequate proof that the defense applied. However, as plaintiff points out, he has not done so because he has not provided evidence

-49-

of what facts he related to the Town's attorney or what advice he received. Without this information, it is impossible to judge whether he reasonably relied on the advice so that it could be said that he did not recklessly disregard plaintiff's rights. An affidavit from Galloway essentially states only that Galloway consulted the attorney and terminated plaintiff after the consultation. (Galloway Aff. ¶ 40) The attorney's affidavit adds that the termination "was consistent with" his advice. (Gill Aff. ¶ 8) This evidence is not sufficient to allow summary judgment for Galloway on the punitive damages claim.

## IV. Conclusion

Defendants' motion for summary judgment will be granted in part and denied in part. Plaintiff's case is adequate to go forward as to her Title VII claim that her termination was based on her gender, her Title VII claim that her termination was retaliation for her complaints about gender discrimination, and her § 1983 claims against defendants Galloway and Klingenschmidt to the extent that they are also based on her allegedly discriminatory/retaliatory termination. She may also seek punitive damages on her remaining § 1983 claims. Defendants' motion for summary judgment will, however, be granted as to plaintiff's claims to the extent they are based on her negative evaluation, any claim against the Town under § 1983, and the § 1983 claims against defendant Burgess. This will result in Burgess being dismissed from the case.

**IT IS THEREFORE ORDERED** that plaintiff's motion to strike a portion of defendants' reply brief (docket no. 40) be, and the same hereby is, denied.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (docket no. 49) be, and the same hereby is, granted in part and denied in part as set out above.  Defendant Burgess is dismissed from the action entirely.

_____
United States Magistrate Judge

July 28, 2005